```
 1                 IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 2

 3  MICHAEL MACKO and DISASTER    )    DOCKET NO. 1:10CV424
    MITIGATION COMPANY,           )
 4         Plaintiffs,            )
                                  )
 5  v.                            )
                                  )
 6  DISASTER MASTERS, INC., and   )    Winston-Salem, North Carolina
    RON ALFORD,                   )    June 7, 2010
 7         Defendants.            )    Motion Hearing
    _____

 8

 9

10                  TRANSCRIPT OF THE TESTIMONY ONLY
             BEFORE THE HONORABLE THOMAS D. SCHROEDER
11               UNITED STATES DISTRICT COURT JUDGE

12

13  APPEARANCES:

14  For the Plaintiff:      NEIL JONES, ESQ.
                            PAUL OSOWSKI, ESQ.
15                          Nelson Mullins Riley & Scarborough, LLP
                            P.O. Box 10084
16                          Greenville, South Carolina 29603-0084

17

18  For the Defendant       DANIEL TAYLOR, JR., ESQ.
                            CHAD HANSEN, ESQ.
19                          Kilpatrick Stockton, LLP
                            1001 West Fourth Street
20                          Winston-Salem, North Carolina 27101

21

22  Court Reporter:         BRIANA NESBIT, RPR
                            Official Court Reporter
23                          P.O. Box 20991
                            Winston-Salem, North Carolina 27120
24
          Proceedings recorded by mechanical stenotype reporter.
25       Transcript produced by computer-aided transcription.
```

1

2                        I N D E X

3   PLAINTIFF'S WITNESSES:                                PAGE:

4

5   ROSS ALLEN KING

6     Direct Examination by Mr. Jones                       3
      Cross-Examination by Mr. Taylor                      15
7     Redirect Examination by Mr. Jones                    19

8
    MICHAEL MACKO
9
      Direct Examination by Mr. Jones                      22
10    Cross-Examination by Mr. Taylor                      29
      Redirect Examination by Mr. Jones                    34
11

12  EXHIBITS:                          MARKED:    RECEIVED:

13  P-1      7/6/2010 email correspondence    12        12
    P-2      4/6/2010 email/stlmt agreement   27        27
14

15

16

17

18

19

20

21

22

23

24

25

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER    (336) 254-7464

1                          P R O C E E D I N G S

2    **ROSS A. KING**, PLAINTIFF'S WITNESS, at 2:40 p.m., being first

3    duly sworn, testified as follows:

4                          DIRECT EXAMINATION

5    **BY MR. JONES**

6    Q    Mr. King, would you please state your name for the record.

7    A    Ross Allen King.

8    Q    And would you tell us your address, please?

9    A    1521 Norwich Road, Winston-Salem, NC, 27127.

10   Q    And are you currently employed?

11   A    No.

12   Q    Have you been previously employed?

13   A    Yes.

14   Q    As -- by whom?

15   A    I recently -- I retired a few years ago from the

16   Winston-Salem Police Department.  Approximately 30 years with

17   the police department, retired as a sergeant, and two years at

18   Greensboro airport.

19   Q    Thank you.  And have you had an opportunity to do any

20   business with Mr. Macko?

21   A    Yes.

22   Q    Could you tell us about that, please?

23   A    We had serious water damage at our residence on Norwich,

24   and we were then introduced to Disaster Masters to take care of

25   the damage, and they came.  They were prompt.  They came there,

1  assessed everything.  They moved stuff out.  They boxed it.

2  They put it into the pods.  They are the same people.  They

3  tore out walls, insulation, rebuilt everything in the basement,

4  and stored all our belongings and this type stuff until they

5  got through.

6  Q    How long ago was that, Mr. King?

7  A    This was back, I believe, back in February.

8  Q    And you referred to Disaster Masters.  That was -- is it

9  your understanding that that was Mr. Macko's former business

10 name?

11 A    Yes.

12 Q    Do you understand that he has a different business name

13 today, or do you know?

14 A    I just -- just Disaster Master or Master -- Disaster

15 Masters, something like that.

16 Q    Okay.  But did Mr. Macko tell you that he was still known

17 as Disaster Masters?

18 A    I didn't deal with Mr. Macko.  I dealt with Kevin.  I

19 dealt with Kevin Hare (phonetic).

20 Q    Is Kevin an employee of Mr. Macko?

21 A    Yes.

22 Q    And did Kevin tell you within the last month or so that

23 they were still known as Disaster Masters?

24 A    I hadn't seen Kevin for a while, but I still had his

25 business cards.

1  Q    Is that how you knew the name was Disaster Masters?

2  A    Yes, from the business cards.

3  Q    Did Mr. Macko or Kevin give you a new business card within

4  the last month?

5  A    Yeah, we got one today, yeah.

6  Q    Do you have that business card with you?

7  A    No, I don't have it with me.  We got one this morning when

8  I went down there, but I don't have it with me, no.

9  Q    Does it say "Disaster Masters" on it?  Do you recall?

10  A    He just -- Kevin said, Here is our new business card and

11  phone numbers and this type thing.  I just took it and put it

12  in my pocket, and I said, Okay.

13  Q    Have you ever had an occasion to talk to a Mr. Alford?

14  A    Yes.

15  Q    Can you tell me about the conversation, including the

16  circumstances that led up to you having the conversation with

17  Mr. Alford?

18  A    Well, I hadn't heard anything in several weeks about the

19  photographs and pictures that were supposed to be restored, and

20  I just called, you know, just called just to see, and the

21  number that was on the card -- Mr. Alford answered the phone,

22  and he said he was Ron Alford, and I said, Okay.  Well, I am

23  calling about, you know, our photographs and comforter.  We

24  hadn't seen them.  I was just calling him about that.  I said,

25  We had talked with Kevin Hare.  He said, Well, Kevin Hare is

1  not there.  He is gone.  I don't know where he is, and what I

2  will try and do is -- I will work with you -- I will work with

3  you to get your property back, and he said, I don't know where

4  he is, or anything like that, but I will work with you to get

5  it back.

6        He wanted the claim number, and I didn't have it right

7  then.  I said, I can send that to you in an email.  Let's see

8  what else he said.  He was -- at that time he was in Phoenix,

9  and he was flying back to New York, but he would be in federal

10 court here today.

11 Q    And, Mr. King, you said you called a number from a card.

12 Was that from the old business card?

13 A    That is from the old business card.  I called Kevin's

14 number on the old business card, and Ron Alford answered the

15 phone.

16 Q    Kevin didn't answer, did he?

17 A    No.

18 Q    You mentioned a claim number.  What do you mean by "a

19 claim number"?

20 A    He said he needed the claim number of our incident.  Could

21 I just email him the claim number, and that he would take care

22 of everything.  He said, Don't worry about it.  He will take

23 care of everything.

24 Q    By claim number, are you referring to an insurance company

25 claim number?

1   A    Yes.

2   Q    What is the name of the insurance company?

3   A    Nationwide.

4   Q    Thank you.  Do you remember anything else that was said by

5   Mr. Alford during this conversation?

6   A    I asked a couple of questions, and he made the statement

7   that he wasn't at liberty to talk about it; he couldn't say

8   anything about it.  And as you probably noticed in my email,

9   there seemed to be a certain vagueness that I picked up on.  I

10  don't know.  I don't know.  It was just -- all of his answers,

11  you know, I'll work on it, I don't know where he is, this kind

12  of thing.  I don't know.  It was just -- it made me a little

13  bit uneasy.

14  Q    Did you believe after this conversation that Mr. Macko was

15  still in business?

16  A    No.  The way Mr. Alford came off, I thought maybe they had

17  filed for bankruptcy, and he was the attorney or something

18  handling everything.

19  Q    What did you feel as a result of that?

20          **MR. TAYLOR:**  Objection, Your Honor.

21          **THE COURT:**  Sustained.

22  **BY MR. JONES**

23  Q    Did you get angry?

24  A    At first, but the way he talked on the phone, I thought

25  this Ron Alford -- I thought maybe he was like a bankruptcy

1  attorney, or something like that.  When you call the office

2  number and someone else answers and says, I am going to take

3  care of everything, I figured it was okay to talk to him.

4  Q    Did you believe, as a result of this conversation, that

5  Mr. Alford was going to take care of everything?

6  A    Yes.  Yes.  Yes.

7  Q    And you are located in North Carolina?

8  A    Yes, sir.

9  Q    Where is this property located that's being restored?

10  A    Oh, our house up on Norwich?  Oh, you mean the pictures.

11  It's here in Winston at some Trotman's photographic place, or

12  something like that.

13  Q    What did you believe Mr. Alford was saying when he said he

14  could take care of it?

15          **MR. TAYLOR:**  Objection, Your Honor.

16          **THE WITNESS:**  Leave everything --

17          **THE COURT:**  Overruled.

18          **THE WITNESS:**  Leave everything to him.

19  **BY MR. JONES**

20  Q    Now, as a result of the conversation, did you follow up

21  with another call or an email or anything?

22  A    I emailed him because he said he needed the claim number,

23  and I didn't have it right then.  So when I found the claim

24  number -- as a matter of fact, I think he said email him the

25  claim number, and I said, Well, can I -- do I email it at Ron

1    Alford@DisasterMasters?  He said, No, email it to

2    Ron@theplan.com.  I said, Well, why can't I just send it to the

3    company here?  And he said, Well, just send it to

4    Ron@theplan.com.

5              **MR. JONES:**  Your Honor, may I approach, please?

6              **THE COURT:**  Yes.

7    **BY MR. JONES**

8    Q    (Hands Witness document) I am going to hand to you a

9    document that you gave to me a few minutes ago.

10             **MR. JONES:**  I apologize.  I do not have a copy.  I

11   literally -- I got it when we got to court today.  We only

12   found out about this witness two hours ago.

13             **MR. TAYLOR:**  Could I look at it, Your Honor?

14             **MR. JONES:**  Absolutely.

15             **THE COURT:**  Yes.

16        (Plaintiff's Counsel handed document to Defendant's

17        Counsel.)

18   **BY MR. JONES**

19   Q    (Hands Witness document) Mr. King, the document I am

20   showing you right now, is that the email that you were just

21   referring to?

22   A    Yes.

23   Q    And is that an email that you sent and then a response

24   from Mr. Alford?

25   A    Yes.

1  Q    Would you tell me the date that you sent the email to

2  Mr. Alford?

3  A    June 6th.

4  Q    That was Friday?

5  A    Yes.  I talked to him Thursday.

6  Q    This past Friday -- I'm sorry.

7  A    Yes.

8  Q    -- is that right?  Is that right, or is that the 2d?  What

9  is today?  Actually, it was yesterday, wasn't it, Mr. King?

10 A    Yes.  I talked with him Thursday.

11 Q    Okay.  So you sent the email yesterday?

12 A    Yes.

13 Q    Would you read into the record, please, the email that you

14 sent?

15 A    That I sent to him?

16 Q    Yes, sir.

17 A    "This is Ross King, and your conversation with me on

18 06/03/10 leads me to the conclusion that something is being

19 hidden by you regarding our items missing.  Please reply to me

20 with facts regarding this case and not vague references to

21 upcoming court issues.  I await your hopefully clear and

22 concise explanations.  The claim number is 6132HP564731.  If

23 there is no response from you within five business days, then I

24 must conclude that this issue has to be addressed with

25 Nationwide Insurance.  Thank you for your prompt attention to

1  this matter."

2  Q    Did you receive a response?

3  A    Yes.

4  Q    And when did you receive a response from Mr. Alford?

5  A    June 6th.

6  Q    Is that at the top part of this document?

7  A    Yes.

8  Q    Did Mr. Alford tell you in that email that, quote, I am

9  not allowed to tell the truth in the matter, closed quote?

10 A    Yes.

11 Q    Did he tell you in that email that he was, quote,

12 personally working to get your belongings returned, closed

13 quote?

14 A    Yes.

15 Q    Did he call Mr. Macko and Kevin, quote, former operators,

16 closed quote, in that email?

17 A    Yes.

18 Q    Did he tell you that he had sent a copy of this to the

19 attorneys representing our case?

20 A    Yes.

21       **MR. JONES:**  Your Honor, I would like to have this

22 marked as an exhibit.

23       **THE CLERK:**  Plaintiff's Exhibit Number 1 marked for

24 identification.

25       (Plaintiff's Exhibit No. 1 was marked for identification.)

1          **MR. JONES:**  I would like to at this time move it into

2    evidence, Your Honor.

3               **THE COURT:**  All right.  Any objection?

4               **MR. TAYLOR:**  No objection, Your Honor.

5               **THE COURT:**  Admitted.

6          (Plaintiff's Exhibit No. 1 was received into evidence.)

7    **BY MR. JONES**

8    Q    Now, Mr. King, did there come a point between yesterday

9    and today that you learned the whole story and the truth?

10              **MR. TAYLOR:**  Objection, Your Honor.

11              **THE WITNESS:**  Yes.

12              **MR. JONES:**  Let me rephrase it, Your Honor.  I'll

13   retract it.

14              **THE COURT:**  Sustained.

15   **BY MR. JONES**

16   Q    Do you believe that you now know the truth of the matter

17   --

18              **MR. TAYLOR:**  Objection, Your Honor.

19   **BY MR. JONES**

20   Q    -- that -- let me finish -- that Mr. Alford referred to in

21   his email?

22   A    Yes, sir.

23              **MR. TAYLOR:**  Objection, Your Honor.

24              **THE COURT:**  Sustained as to form.

25

1  BY MR. JONES

2  Q    What do you believe happened with Mr. Macko and his

3  business?

4            MR. TAYLOR:  Objection, Your Honor.

5            THE COURT:  Do you have a basis for his statement?

6  Why don't you ask him first?

7            MR. JONES:  Yes, Your Honor.  I would be glad to.

8            THE COURT:  I think you need a foundation for what

9  may be about to come.

10           MR. JONES:  Certainly, Your Honor.

11           THE COURT:  Otherwise, I don't know.  I am going to

12  deny it unless there is a foundation.

13           MR. JONES:  I understand, Your Honor.

14  BY MR. JONES

15  Q    So after the communications with Mr. Alford, what did you

16  believe had happened to Mr. Macko's business?

17           MR. TAYLOR:  Objection, Your Honor.

18           THE COURT:  Overruled.

19           THE WITNESS:  I thought that they had gone out of

20  business, and I was wanting -- all I was wanting was my

21  photographs and this type thing -- and this type stuff that was

22  damaged.  That was all I wanted back.  The way Mr. Alford

23  talked, I thought they had gone out of business and he took

24  over.

25

1  **BY MR. JONES**

2  Q    Did you learn something different?

3  A    Yes.

4  Q    What did you learn, and how did you learn it?

5  A    I learned this afternoon that he had -- there was some

6  type of discussion about their name and that he was taking them

7  to court over the use of that name, and that's pretty much it.

8  Q    How did you find this out?

9  A    We went down there this morning.  Well, we're both

10 retired, so we didn't have nothing to do.  I said, Well, you

11 know, let's go down there and see if we can find this because I

12 was at the point that I thought it was gone.  I thought it was

13 lost.  Like I said, generally, the federal court is bankruptcy.

14 So that's what I figured.  So I thought I would go down to the

15 office and see if I could talk to somebody to, you know -- to

16 where -- you know, to where our stuff was.

17     We went down there and talked with them, and then I found

18 out about this.  Mr. Alford had already advised me about

19 federal court.  I wanted to know because I know, you know, with

20 the bankruptcy thing I may not have a chance to see any of my

21 stuff no more.  So I went down there to talk to a person to see

22 if we could find it.

23 Q    Where did you go?

24 A    To their office down on West Fourth Street, 936 West

25 Fourth Street.

1  Q    And who is "their office"?  Whose office?

2  A    The disaster people.

3  Q    Mr. Macko?

4  A    Yes, his office, yes.

5  Q    Thank you.

6           **MR. JONES:**  Your Honor, no further questions.

7           **THE COURT:**  Any cross?

8           **MR. TAYLOR:**  Yes, sir, Your Honor.

9                     CROSS-EXAMINATION

10 **BY MR. TAYLOR**

11 Q    Sergeant Ross, you are retired Sergeant Ross; is that

12 correct?

13 A    Retired Sergeant King, yes, sir.

14 Q    Ross King.  My apologies to you, sir.  How long were you

15 with the police department?

16 A    Total 30 years.  Two years with Greensboro.

17 Q    Now, I take it that you suffered some sort of loss or

18 damage.  Was it to your home?

19 A    Yes.

20 Q    And what was the nature of that loss?

21 A    It's severe water damage there, and they had to come take

22 out the insulation; and we had several items that were damaged

23 and destroyed due to water, and Mr. Macko's company came.  They

24 were prompt.  They showed up, and they started doing all the

25 restoration work.

```
 1  Q    When was this loss?

 2  A    It was back in February.  It was back in -- yeah, it was

 3  back in February.

 4  Q    February of 2010?

 5  A    Yes.

 6  Q    How long were they on the job at your home?

 7  A    Oh, I imagine they were there a good three weeks, a good

 8  three weeks.

 9  Q    Would that have continued into March of 2010?

10  A    Yes.

11  Q    Okay.  And when they left, were you satisfied with the

12  work and services they had provided?

13  A    Yes, perfect.

14  Q    Did they leave you any information by which you could

15  contact them?

16  A    Yes.

17  Q    And they left you a business card, and it had a telephone

18  number on it?

19  A    Yes.

20  Q    I presume that they had your name, address, and telephone

21  number, did they not?

22  A    Yes.

23  Q    Now, the items that I believe you said are missing are

24  photographs, comforter, and some other things?

25  A    There were a couple of books, and the main thing -- the
```

1  main thing was -- the main thing were my photographs.

2  Q    Your photographs.  And have you gotten those photographs

3  back now?

4  A    Not yet.  The Trotman -- the people that are redoing them,

5  they said within, I don't know, maybe another week or so they

6  would be done.

7  Q    Would I be correct then, Sergeant King, in understanding

8  that from the last time you saw anyone from Mr. Macko's

9  company, which I think you said it would be in the March of

10 2010 time period, that is, prior to today, until today, that no

11 one from that company reached out to you or contacted you in

12 any way?

13 A    No, I always called them.

14 Q    But at no time from March until today, did anyone reach

15 out or call you?

16 A    Only one time.  They got back -- no, I called them.  I

17 would always call every few weeks, something like that.

18 Q    Okay.  Now, what do you understand the name of Mr. Macko's

19 company to be?

20 A    Disaster Master, Master Disaster, something like that.

21 Q    Do you have a copy of the card that you said you were

22 given this morning?  Do you have that with you?

23 A    No, I took it -- no, I took it back home.  No, I don't

24 have it with me, uh-uh.

25 Q    Did anyone with Mr. Macko's company tell you that the name

1  of his company had been changed?

2  A    I don't remember getting into that.  When I went -- we

3  went down there this morning.  We just started talking about

4  the pictures and getting that returned and the comforter and

5  this type thing.

6  Q    So as of the moment that -- well, as of right now, you

7  didn't know that the name his company had been changed?

8  A    No.

9  Q    Where is Mr. Macko's company physically located?

10 A    Their address is 946 West Fourth Street, and they are

11 behind the State Farm Insurance Company.  They are at 930, and

12 they are behind them.

13 Q    Had you been there prior to today?

14 A    No.

15 Q    How did you know to go to that location?

16 A    That was on the business card that I had.

17 Q    Do you have that business card with you?

18 A    No, that was the card Kevin gave me back in February

19 sometime.

20 Q    Now, with regard to everything that's happened to you to

21 this point in time with regard to your unfortunate loss, is

22 there anything about that that's caused you to feel unkindly or

23 think unkindly about Mr. Macko or whatever company he might

24 have?

25 A    No.  I even called them on Saturdays, Sundays, 7:00,

1  8:00 at night.  No problem at all.

2  Q    That is still how you feel here today, as you are

3  testifying?

4  A    Oh, yeah.  If something else like this happened, they

5  would be -- I'd pick up the phone.

6  Q    And what number would you call him at today?

7  A    Once I found his new business card, I would call him at

8  that one.

9          **MR. TAYLOR:**  No further questions, Your Honor.

10          **THE COURT:**  All right.  Any redirect?

11          **MR. JONES:**  Yes.  And also let me apologize to the

12  Court for not remaining seated during questioning the witness.

13  I have been in the Middle District before and I knew that.  I

14  had just forgotten.

15          **THE COURT:**  You are welcome to stand or sit.

16          **MR. JONES:**  Thank you, Your Honor.

17                        REDIRECT EXAMINATION

18  **BY MR. JONES**

19  Q    Mr. King, Mr. Taylor asked you a question about have you

20  been satisfied and happy or something with Mr. Macko's work.

21  Do you remember that question?

22  A    Yes.

23  Q    I think, however -- well, strike that.  Were you concerned

24  between June 3rd and yesterday -- or, actually, between

25  June 3rd and today about whether or not your pictures were

1  going to be restored?

2  A    Just a general concern.  That's all because I hadn't seen

3  them.  So we just decided to drive down there.

4  Q    And why did you decide to drive down there today?

5  A    Generally, whenever it strikes me I ain't got those

6  pictures back yet, and I'll go ahead and go down there.

7  Q    Was it your understanding that Mr. Alford was going to

8  take care of those pictures?

9  A    That's what he led me to believe.  I mean, that's the way

10  he talked on the phone.  With the email, he said, you know,

11  we'll -- I am going to help you and this type thing.  I thought

12  he was in charge.

13  Q    And did you think that Mr. Macko was out of the picture up

14  until today?

15  A    Yeah.  I thought maybe he had sold it or moved away,

16  especially when he advised me that Kevin wasn't there no more,

17  and he didn't know where he was.

18          **MR. JONES:**  Thank you.  No further questions, Your

19  Honor.

20          **THE COURT:**  You may step down, sir.

21          **MR. JONES:**  Your Honor, may I ask that the witness be

22  released?

23          **THE COURT:**  Any objection?

24          **MR. TAYLOR:**  No, Your Honor.

25          **THE COURT:**  He may be released.

1      (At 3:01 p.m., the witness was excused.)

2           **MR. JONES:**  Your Honor, I only have a few more

3   comments, and they would be in the form of pointing the Court's

4   direction -- or notice to the affidavits that we submitted from

5   other third parties.  One of the individuals --

6           **THE COURT:**  This is a Carter and Savvas, I think?

7           **MR. JONES:**  Yes, sir.  Mr. Savvas -- I am not sure

8   how to pronounce that, and I just note for the Court, paragraph

9   7 at page 2 of his affidavit says that the person answering the

10  phone informed him that he could not trust Mr. Macko to

11  complete the work because the company was out of business

12  because he had sued Mr. Macko for stealing his business name.

13      And then I would also point the Court's attention to the

14  affidavit of Norman Carter and, particularly, paragraphs 9 and

15  10 on page 2 of that affidavit.  Number 9, the person who

16  answered the phone also explained that Mr. Macko had stolen the

17  name Disaster Master from him, and I point specifically to the

18  word "stolen."  And paragraph 10 said that Mr. Alford then

19  stated that Mr. Macko's offices were shut down and no longer in

20  business.

21      Your Honor, then finally, I would submit for the Court the

22  affidavit of Mr. Macko, who is here today, and we're glad to

23  put him on the stand, if you need him; but everything is said

24  in his affidavit, particularly on page 5 when he talks about it

25  is his understanding that Cincinnati Insurance Company will not

1  currently use his services because they had been told that

2  Mr. Macko is, quote, bankrupt, not reputable, and has many

3  complaints with the Better Business Bureau, closed quote.

4            **THE COURT:**  What is that misunderstanding -- or

5  understanding, rather, based on?  Did he contact the company?

6            **MR. JONES:**  Your Honor, I think so, but I'll have to

7  call Mr. Macko to talk about that, with the Court's pleasure.

8            **THE COURT:**  That's up to you, if you would like.

9            **MR. JONES:**  That's fine.  Well, Your Honor, I will be

10  glad to put him on the stand.  The answer to your question is,

11  yes, he understood it from a -- I believe it says in his

12  affidavit --

13            **THE COURT:**  I was reading paragraphs 21, 22, and 23.

14            **MR. JONES:**  Well, I tell you, for the Court's help on

15  that, I will call Mr. Macko to the stand.

16  **MICHAEL MACKO**, PLAINTIFF'S WITNESS, at 3:05 p.m., being first

17  duly sworn, testified as follows:

18                        DIRECT EXAMINATION

19  **BY MR. JONES**

20  Q    Would you please state your name for the record.

21  A    It's Michael Macko.

22  Q    And, Mr. Macko, are you the owner of a business?

23  A    Yes, I am.

24  Q    And what is the name -- current name of that business?

25  A    Disaster Mitigation or DMR.

Case 1:10-cv-00424-WO-LPA   Document 28   Filed 06/25/10   Page 22 of 38

1  Q     Is that the new name of the company that was formerly

2  known as Disaster Master?

3  A     It is.

4  Q     It is located here in Winston-Salem?

5  A     Yes, it is.

6  Q     Mr. Macko, you have submitted an affidavit in this case.

7  I will ask only a couple questions about it.  You heard the

8  Court ask the question about how you know that Cincinnati

9  Insurance Company does not intend to send you any more

10 business.  Can you please explain how you know that?

11 A     The adjuster had called our number.  We've been trying to

12 notify people.  Obviously, you can't notify -- you don't know

13 everyone, so you miss some people.  We got a call from an

14 adjuster at Cincinnati Insurance.  His name is Phil Reaves.  He

15 was wanting to get in touch with us about a claim that was

16 ongoing.  Mr. Alford told him --

17            **MR. TAYLOR:**  Objection.

18            **THE COURT:**  Overruled.

19            **THE WITNESS:**  Mr. Alford told him that -- or he

20 stated --

21            **MR. TAYLOR:**  Objection, Your Honor, double hearsay.

22            **THE COURT:**  Overruled.  Hearsay is admissible, I

23 think, on preliminary injunction hearings.

24            **MR. TAYLOR:**  I am not sure about double hearsay, Your

25 Honor.

1          **THE COURT:**  All right.  You may proceed.

2          **THE WITNESS:**  Phil Reaves said that Mr. Alford had

3    told him that we were bankrupt and out of business and that we

4    had a lot of problems and a lot of complaints to the Better

5    Business Bureau and that they should do business with him

6    rather than us and that he could provide the services.

7          And so Phil, I think, called -- I think we had given him

8    our information of new numbers, but he had just got them

9    confused.  So he eventually got in touch with us and talked to

10   us, but he said he did not want to be involved if there was

11   litigation going on and was concerned about our financial

12   wherewithal because Mr. Alford had told him that we were in

13   bankruptcy, and we assured him that we were not.  He said,

14   well, if we could get it cleared up or get him substantiation

15   of that fact, then he would consider sending us claims again.

16   **BY MR. JONES**

17   Q    And, Mr. Macko, pursuant to the settlement agreement --

18   well, first of all, did you settle the New York litigation?

19   A    I believe we did.

20   Q    Did you think you did?

21   A    Yes, I did.

22   Q    And did you abide by that settlement agreement to the best

23   extent possible?

24   A    We believe we have.

25   Q    In particular, did you stop using the Disaster Master

1  name?

2  A    Well, we got -- we changed the logos on our vehicles.  We

3  got new business cards.  We took down any logos anywhere we

4  could.  We notified the majority of the people we do business

5  with or what we thought was the majority of the people we did

6  business with, but we do thousands, I mean, literally

7  thousands, of claims a year.  Just with Nationwide we do 3- or

8  $4 million worth of business.  We are on a Blue Ribbon program

9  with them.  So it is very critical -- I mean, we have to go

10 through a credentialing process that's in depth.  It takes two

11 months to get credentialed.  They check our credit ratings.

12 They check the Better Business Bureau.  Just lots and lots and

13 lots of items.

14     So we thought we had notified each and every person

15 because, you know, people don't want to be near bankrupt

16 companies, especially in this economy.  So we thought we had.

17 I am not saying that there is something still not out there

18 with our name on it, but we bought new uniforms.  We re-logoed

19 our trucks.  We paid Mr. Alford $25,000.  We thought we did

20 everything that they asked.  We gave them all of our phone

21 numbers, which has created mayhem for us, but we allowed him to

22 keep all of our phone numbers.

23           **MR. JONES:**  May I approach again, Your Honor?

24           **THE COURT:**  Yes.

25

**BY MR. JONES**

Q    (Hands Witness document) Mr. Macko, I am going to show you what we believe to be the settlement agreement in this case. It's an email that's been referred to already in this court today as April 6th.  Is there anything in the terms of that email/settlement agreement that requires you to proactively inform customers of your new name?

A    No, I never saw anything that was in it.  We just felt it was in our best interest to try to inform as many individuals as we could.  We thought probably, you know, Mr. Alford would explain what had happened and, you know, they would then -- we thought he would give them actually our new number is what we really thought would happen, but it is not in that agreement, but we thought that would happen.  It has not happened.

        **THE COURT:**  Just for the record, the email -- is that the same document that's Exhibit B to the verified complaint?

        **MR. JONES:**  Your Honor, let me double-check.  I think the answer to that is yes.  Your Honor, the email that I just showed him has one additional email from me to Bob Leino, the attorney who previously represented Mr. Alford; but, otherwise, the last portion of the email of the document I just gave him is identical to Exhibit B.

        **THE COURT:**  Well, for ease of reference, why don't we go ahead and mark it.  Since you've handed him a document, can we just mark that as Exhibit 2?

1          **MR. JONES:**  Absolutely, Your Honor.

2          **THE CLERK:**  Plaintiff's Exhibit Number 2 marked for

3  identification.

4      (Plaintiff's Exhibit No. 2 was marked for identification.)

5          **MR. JONES:**  Your Honor -- would you like to see a

6  copy?

7      (Plaintiff's Counsel handed Defendant's Counsel exhibit.)

8          **MR. JONES:**  Your Honor, I move it into evidence at

9  this time.

10          **THE COURT:**  Any objection?

11          **MR. TAYLOR:**  No, Your Honor.

12          **THE COURT:**  Okay.  All right.  Admitted.

13      (Plaintiff's Exhibit No. 2 was received into evidence.)

14  **BY MR. JONES**

15  Q    Just while we are talking about this, Mr. Macko, do you

16  see an email from Mr. Leino dated Tuesday, April 6, at 1345?

17  A    Yes, I do.

18  Q    What does Mr. Leino say in that email?

19  A    He says, "Neil, my client is agreeable.  Please confirm

20  receipt, and I will send the banking info."  And then you

21  called us to wire him -- wire transfer $25,000 to him.

22  Q    Did I respond to Mr. Leino?

23  A    You did.  You said, "Thank you.  We now have an agreement.

24  Please forward the routing information."

25  Q    What is the date of my email?

BRIANA NESBIT, RPR      OFFICIAL COURT REPORTER   (336) 254-7464

1   A    April 6th.

2   Q    Now, Mr. Macko, as part of the settlement agreement, did

3   you agree to change your corporate name --

4   A    We did.

5   Q    -- your business name?

6   A    We did, yes.

7   Q    And did you do that?

8   A    We did.

9   Q    Was there a snafu in doing that?

10  A    We had our secretary go online and get the documents to do

11  it, and we filled them and then we called and we had them

12  changed.  Sent the information in, but, apparently, it didn't

13  process through the system.  We had to actually get an

14  associate of yours to finally get it processed through the

15  system to do that.

16  Q    Was that done -- was the correct procedure finally used

17  immediately upon you learning that it had been rejected?

18  A    Yes.

19  Q    But you -- did you attempt early on yourself to handle the

20  name change?

21  A    Yeah.  We want this to end.  We want to continue our

22  business.

23  Q    Did you do that within the required 14 days, as stated in

24  the settlement agreement?

25  A    Yes.

1          **MR. JONES:**  Your Honor, no further questions.

2          **THE COURT:**  All right.

3                          CROSS-EXAMINATION

4    BY MR. TAYLOR

5    Q    Actually, the name change, Mr. Macko, with the North

6    Carolina Secretary of State was not until late May of 2010;

7    isn't that correct?

8    A    I don't know the exact date that -- you mean that it

9    actually got changed?

10   Q    Yes, sir.

11   A    I don't know the exact date it got changed.

12   Q    On or about May of 2010?

13   A    Yes.  I wasn't involved in the final changing of it.

14   Q    I see.  Now, is it your testimony here today that you

15   transferred to Mr. Allred every single telephone number under

16   which you did business under Disaster Master?

17          **MR. JONES:**  Your Honor, just for clarification, I

18   think it might be helpful to correct your client's name.  It is

19   not Allred; it's Alford.  Just so the record is clear.

20          **THE COURT:**  All right.

21          **THE WITNESS:**  The numbers -- there was a lot of

22   discussion as to how the transfer should take place, and it

23   became a debacle in trying to transfer the phone numbers.

24        As I understand it, the majority of the transferred -- the

25   numbers were transferred, like 10 or 15 numbers, and there are

1  three that we -- we had to disconnect them in order for them to

2  retain them.  So the phone companies had, you know, their own

3  system, and it got cumbersome in doing it; but as I understand

4  it, to answer your question, all of the -- we no longer retain

5  any of the numbers, but there were, like, 12 or 13 that we gave

6  Mr. Alford, or we helped him transfer.  We had to actually get

7  on the phone with him -- or the attorneys got on the phone with

8  Mr. Alford's attorney, and there are three -- two or three that

9  we had to terminate in order for him to get, but I have been

10 told by our attorneys that he has not taken those numbers yet.

11 **BY MR. TAYLOR**

12 Q    Have you sent anything or have you seen anything that your

13 attorney sent to him, my client or his lawyer, advising of what

14 you've just testified?

15 A    Something to state that, yes, similar.

16 Q    So you have?

17 A    Yes, I have.

18 Q    So it is your testimony -- first of all, in your direct

19 examination, I believe you testified that you transferred all

20 of the telephone numbers; correct?  Didn't you say that?

21 A    We didn't actually -- we were helping in the transfer of

22 them.

23 Q    I'm sorry.  Did you not testify that you transferred all

24 of the telephone numbers on direct examination?

25 A    Yes, I guess so.

1  Q    The fact of the matter is you did not transfer all of the

2  telephone numbers; correct?

3  A    There were three that we had to terminate in order to

4  transfer them.  So, yes, to answer your question.

5  Q    That's fine.  So you transferred every telephone number

6  except three?

7  A    If I'm not mistaken, yes.

8  Q    Now, did you on any of those telephone numbers put any

9  kind of diverter or put any kind of a message system or

10 anything of information that would direct the business back to

11 you?

12 A    No.

13 Q    You did not?

14 A    We did not.

15 Q    Now, sir --

16 A    Well, I did not should be a better statement.

17 Q    Well, do you know whether anyone else did?

18 A    As I understand, the phone company -- until someone picks

19 the new phone number up, the phone company diverts -- puts a --

20 says this previous number 723-6624 has been changed to whatever

21 the new number would be until somebody retains the new number.

22 Q    So what is the telephone number that there is now a

23 diverter that comes to your company, Disaster Mitigation

24 Company?

25 A    I believe Mr. Alford retained that one.  So I don't

1  believe there are any.  I could be wrong, but to my best

2  knowledge there are none now.

3  Q    There are three numbers that are not in Mr. Alford's

4  possession?

5  A    Yes, two or three, I believe.

6  Q    Two or three.  What is the status of those numbers today?

7  A    There are sitting out there waiting for Mr. Alford to call

8  and give his credit information in order to gain the phone

9  numbers.

10 Q    None of those messages have -- none of those numbers have

11 diverters that would send the business back to your company,

12 Disaster Mitigation Company; is that correct?

13 A    As I understand it, that is correct.

14 Q    What is the basis of that understanding, sir?

15 A    I believe I phoned the 1-800-828-4780, and I believe it

16 says disconnected, and the other is a fax number that I believe

17 also says, This number has been temporarily disconnected, of

18 the two.

19 Q    Do you have a writing that advises my client as to those

20 numbers and what he needs to do to activate those numbers?

21 A    It was --

22       **MR. JONES:**  Your Honor, we'll stipulate to that, that

23 there are many writings that were sent by myself to Mr. Leino,

24 their former attorney, that advised him specifically, exactly

25 how to get those numbers.  We'll stipulate to that.

1          **MR. TAYLOR:**  Well, Your Honor, I don't think I can

2    stipulate to that.

3          **THE COURT:**  I understand.  You can ask whether the

4    witness knows of any.

5          **MR. TAYLOR:**  Sure.

6    **BY MR. TAYLOR**

7    Q    All right, sir.  Just a couple more questions.  Who is the

8    gentleman with Cincinnati Insurance Company that you spoke

9    with?

10   A    Phil Reaves.

11   Q    Phil Reaves.  And where is he physically located?

12   A    In Greensboro, North Carolina.

13   Q    In Greensboro, North Carolina.  When did you last talk

14   with him?

15   A    Several weeks ago.  A couple to several weeks ago.

16   Q    And I understand from your testimony that you indicated he

17   said if you would get -- if you and your new company would get

18   him certain information that he would move forward?

19   A    Yes, that's correct.

20   Q    Did you get the requested -- did you get to Cincinnati the

21   requested information?

22   A    I am not -- we are talking about attorneys.  I am not

23   really sure how to get something that says you are not

24   bankrupt.  So we haven't done anything yet because we've been

25   spending four hours a day on this.  It's been taking up my

1  entire day each day.

2  Q    So in three weeks, you haven't done anything -- in three

3  weeks, you haven't done anything to get the information that

4  was requested by Cincinnati to Cincinnati so that your new

5  company, Disaster Mitigation Company, could begin doing

6  business with Cincinnati; is that correct?

7  A    Yes, that's correct.

8            MR. TAYLOR:  No further questions, Your Honor.

9            THE COURT:  Any redirect?

10           MR. JONES:  Yes, Your Honor.

11                    REDIRECT EXAMINATION

12 BY MR. JONES

13 Q    Mr. Macko, Mr. Taylor asked you about a name change and

14 when that occurred.  Do you remember those questions?

15 A    Yes, I do.

16 Q    Let's talk -- let's define what you understood to be a

17 name change.  What do you understand to be a name change?

18 A    Where -- we went on the Secretary of State's website, and

19 they have a form to fill out, and we filled out the form and

20 paid the money with credit card, a debit card; and they would

21 change our name.  It's a particular form.  I don't know the

22 number, and that was what we did -- I did, along with our

23 office manager, and we did that.  I don't remember the day we

24 did it, but we did it within that 14-day time frame.

25 Q    You did it within the 14-day time frame after April 6;

1  correct?

2  A     Yes.

3  Q     The additional name change that you referred to and that

4  you testified to occurred in late May, what was that name

5  change?

6  A     Apparently, either the Secretary of State notified us or

7  notified you all -- I don't know who, but somehow we found out

8  because of something that was on the form they needed

9  additional information in order to transfer it.  I think Goran,

10  G-O-R-A-N, called our office and said, Look, you have to have

11  this additional information; and so then he did it, and he got

12  the additional information.  Goran is a law partner of Neil's.

13  He got the additional information and had it changed.

14  Q     Do you recall Mr. Taylor's questions about the two or

15  three numbers, I believe you said, that were canceled or

16  disconnected?  Do you recall that testimony --

17  A     I do.

18  Q     -- those questions?  Were they with a specific phone

19  company?

20  A     I believe that the numbers were with AT&T.  We had numbers

21  with several different companies:  Verizon, Windstream, AT&T,

22  and maybe one more company was involved.  And those -- and each

23  company had a different set of sequences that they wanted you

24  to follow to try to have somebody get new numbers.  If you've

25  ever dealt with a phone company, you will understand how

1  difficult it is.  It was interesting to try to transfer them.

2  Q    Approximately, how long did you work with the various

3  phone companies in getting the phone numbers transferred?

4  A    Days and hours and hours during the days.  It eventually

5  came to the point that actually you guys were doing all of it;

6  and, finally, Ron Alford's wife called me directly, and I get

7  on the phone and talk to Verizon for an hour and a half to get

8  them to give them to Mrs. Alford because they had to give their

9  credit information instantaneously with us getting rid of the

10  number.  So it was a difficult task to do.

11  Q    Is it true that on the day that you released the AT&T -- I

12  believe you said they were AT&T phone numbers?

13  A    They are Verizon -- oh, the AT&T, yes, were the ones that

14  I think he doesn't have right now.

15  Q    Is it true on the day you released the AT&T phone numbers

16  Mr. Alford could have acquired those phone numbers?

17           **MR. TAYLOR:**  Objection, Your Honor.

18  **BY MR. JONES**

19  Q    Do you know?

20           **THE COURT:**  Overruled.

21           **THE WITNESS:**  Yes, he can call any time to acquire

22  those numbers, according to AT&T in my discussions with AT&T.

23  **BY MR. JONES**

24  Q    Did you have a discussion specifically with AT&T --

25  A    I did.

1   Q      -- regarding that issue?

2   A      I did.

3              **MR. JONES:**  No further questions, Your Honor.

4              **MR. TAYLOR:**  No questions, Your Honor.

5              **THE COURT:**  You may step down, sir.

6       (At 3:23 p.m., the witness was excused.)

7       **(END OF TESTIMONY.)**

8

9                              * * * * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    UNITED STATES DISTRICT COURT

2    MIDDLE DISTRICT OF NORTH CAROLINA

3    CERTIFICATE OF REPORTER

4

5

6           I,  Briana L. Nesbit, Official Court Reporter,

7    certify that the foregoing transcript is a true and correct

8    transcript of the proceedings in the above-entitled matter.

9

10          Dated this 25th day of June 2010.

11

12

13          _____
            Briana L. Nesbit, RPR
14          Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25